IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SEDA FRANCE, INC., | § | CASE NO. 10-_____-___ |
| | § | CHAPTER 11 |
| DEBTOR | § | |
| | § | |
| 8301 SPRINGDALE ROAD, #800 | § | |
| AUSTIN, TEXAS 78724 | § | |
| | § | |
| TAXPAYER IDENTIFICATION NO.: | § | |
| 26-2145654 | § | |

### DECLARATION OF ROBERT HERNANDEZ IN SUPPORT OF SEDA FRANCE, INC.'S VOLUNTARY PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE AND FIRST DAY MOTIONS

I, Robert Hernandez, state:

1. I am the Chief Executive ("CEO") of Seda France, Inc. ("Seda France") a Texas Corporation, and have personal knowledge about the operations of Seda France's business. I have served in this position since March 10, 2008, and am familiar with Seda France's day-to-day operations, business affairs, books and records. I have personal knowledge of the statements set forth herein.

2. On October 17, 2010 (the "Petition Date"), Seda France filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Seda France continues to operate its business as a debtor-in-possession.

3. In order to operate effectively and to minimize the adverse effects of a Chapter 11 filing, Seda France has requested various types of relief in its "First Day" motions and applications (the "First Day Motions") filed with this Court. I am one of the primary parties responsible for implementing Seda France's restructuring efforts and am authorized to submit this declaration in support of such motions and applications.

4488539.1
59713.1

4. As CEO of Seda France and having personal knowledge about the operations of its business, I have supervised its business and financial affairs and have participated in strategic planning associated with its ongoing business decisions. As a result of my first-hand experience and knowledge, and through my review and knowledge of Seda France's books and records and other information, including discussions with management, employees, key creditors, and affiliates, as well as outside professional advisors, I have formed opinions as to the necessity of obtaining the relief sought by Seda France in its First Day Motions and applications in order to permit it to continue to operate effectively and manage its Chapter 11 case efficiently. I believe that there will be significant deleterious effects if the requested relief is not obtained.

5. I submit this Declaration in support of the Seda France's First Day Motions. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of Seda France's books and records, information conveyed to me by other representatives of Seda France, including discussions with managers, other employees, and outside advisors, as well as my experience and knowledge of Seda France's operations and financial condition. I am competent to testify to these matters, and, if I were called as a witness, I would testify to the facts and opinions set forth below. Where my opinions relate to legal matters, I have consulted with and am relying upon the advise of Seda France's lawyers with respect to such matters.

6. Part I of this Declaration describes Seda France's business and the circumstances leading up to the filing of its Chapter 11 petition. Part II sets forth the relevant facts in support of Seda France's First Day Motions. I have read and reviewed the First Day Motions and all the allegations contained in each such motion are true and correct to the best of my knowledge, information, and belief.

2

## PART 1: Seda France's Background

7.       Seda France develops and internationally distributes home fragrance products, including, but not limited to, candles, bath and body products, diffusers, and room mists. Seda France maintains its corporate headquarters and candle manufacturing plant in Austin, Texas.  Seda France operates primarily as a wholesale distributor, marketing its products for resale to companies and/or individuals with store fronts.  Seda France's products are marketed through in-house employees and other independent contractor representatives along with showrooms located in New York, Los Angeles, Dallas, and Seattle.  Additionally, Seda France directly sells its products to its customers on its website located at www.sedafrance.com.  Uniquely, Seda France has a popular custom candle line that allows its customers to custom design candles and the candles' packaging for resale or as gifts. For example, spas and other retail establishments have custom designed candles and packaging for resale that are appropriate for their businesses and brides/wedding planners have custom designed candles for guest's gifts at weddings.

8.       Seda France is primarily dependent on its independent Representatives and showrooms (collectively, the "Representatives") to market its products, to generate revenue, and push sales growth.  It has no "bricks-and mortar" storefronts.  Approximately ten percent (10%) of Seda France's revenues are from internet based sales directly to consumers.

9.       In early 2008, Seda France and Aegis Texas Venture Fund II, L.P. ("Aegis") commenced negotiations in an attempt to reach an agreement pursuant to which Aegis would loan funds to Seda France.  The following is a list of the documents circulated among the Seda France and Aegis during the negotiations: (1) Loan and Security Agreement ("Security Agreement"); (2) Intellectual Property Security Agreement ("IP Security Agreement"); (3) Tranche 1 Promissory Note ("Note"); (4) Warrant Purchase Agreement and Warrant to Purchase Shares of Common Stock of

3

4488539.1
59713.1

Seda France, Inc. ("Warrant Agreements"); and (5) Deposit Account Control Agreement ("Account Agreement") (when collectively, the "Loan Documents"). Although the parties reached a general agreement under which Seda France would borrow up to Two Million, Five Hundred Thousand Dollars ($2,500,000.00) from Aegis, upon information and belief, some, part, or all of the transactional documents were not executed by Aegis and Seda France in identical form. In March of 2008, Seda France borrowed One Million, Two Hundred Twenty Five Thousand Dollars ($1,250,000.00) from Aegis. In August of 2008, Seda France borrowed an additional One Million, Two Hundred Twenty Five Thousand Dollars ($1,250,000.00) from Aegis (collectively, the "Borrowed Funds"). To date, Seda France has repaid approximately One Million, Two Hundred Thousand Dollars (exactly $1,198,913.48) to Aegis. Although, upon information and belief, a complete and identical set of documents was never executed, Seda France is informed that Aegis contends it has an enforceable lien upon virtually all of the assets of Seda France to secure payment of the Borrowed Funds (the "Alleged Aegis Lien").

10. On July 21, 2010, after Seda France began struggling to make payments as demanded by Aegis, and years after Aegis provided the Borrowed Funds to Seda France, Aegis unilaterally filed the Aegis Financing Statements.

11. Between mid-July 2010 and the Petition Date, Seda France made multiple proposals to Aegis. Aegis rejected each proposal, stating that it wanted to be given a large ownership position in Seda France. For the protection of all creditors and parties-in-interest, Seda France was forced to file for protection under the Bankruptcy Code.

12. Through its First Day Motions, Seda France does not ask for remarkable or unreasonable relief. Instead, it merely asks that this Court allow it to maintain the status-quo, giving it time to evaluate its product line and business plan, and adjust them as needed to become a profitable

4

company on a post-confirmation basis. While Seda France certainly plans to make changes in the coming months, forced change at the outset of this extremely stressful bankruptcy process would likely sound the death-knell on Seda France's reorganization efforts before they can begin.

## Part 2: First Day Motions[1]

13. Contemporaneously with the filing of its Chapter 11 petition, Seda France filed First Day Motions that it believes are necessary to enable it to operate in Chapter 11 with a minimum amount of disruption and loss of productivity and goodwill. Seda France asks for certain first day relief to allow it to continue operating its business in the ordinary course on a postpetition basis.

14. Because certain relief requested in Seda France's First Day Motions requires immediate attention, Seda France filed its Request for Expedited Consideration of Certain First Day Matters.

### i. *Motion for Interim and Final Orders Authorizing the Use of Cash Collateral (the "Cash Collateral Motion")*

15. Seda France needs immediate access to its cash, which Aegis Texas Venture Fund II, L.P. alleges is its cash collateral, in order to pay Seda France's employees, purchase product, maintain services, operate and preserve its business, and meet its administrative responsibilities in its Chapter 11 bankruptcy case. Despite the fact that the Alleged Aegis Lien is *per se* avoidable pursuant to Bankruptcy Code §§ 544 and 547 and any claim of Aegis is disallowable pursuant to Bankruptcy Code § 502(d), until final resolution of the Lien Adversary, it is appropriate for Seda France to obtain court approval for use of its cash. In order to pay its employees, purchase products and supplies, maintain services, operate and preserve its business, and meet its administrative responsibilities in this chapter 11 bankruptcy case, Seda France needs immediate access to its cash in which Aegis asserts an avoidable lien and a disallowable claim.

---

[1] Capitalized terms not otherwise defined herein shall contain the meaning ascribed to them in their respective motions.

16. The use of cash collateral by Seda France is necessary on an expedited, interim basis in order to avoid an interruption of its business and the imminent, irreparable harm to its bankruptcy estate that would result from its failure to pay wages and other basic expenses of day-to-day operations. A list of the critical expenses which must be paid by Seda France during the next few weeks is more particularly described in the Budget attached as *Exhibit A* to the Cash Collateral Motion.

17. As adequate protection for the use of Aegis' Alleged Cash Collateral, Seda France agrees to solely to pay those expenses in the amounts and categories set forth on and in accordance with the budget attached to the Cash Collateral Motion as *Exhibit A*. As a result of the Lien Adversary, no other adequate protection will be provided.

### ii. *Motion for Interim and Final Orders Establishing Adequate Assurance for Payment of Utilities*

18. In connection with the operation of its business, Seda France obtains gas, electricity, water, waste, telephone service, and security service from certain utilities. As a result of the commencement of Seda France's Bankruptcy Case, Seda France is unable to pay its utility providers for invoiced but unpaid prepetition services. Seda France requests that the Court enter an order, on an interim basis, and on a final basis after notice and hearing, that Seda France's offer to provide adequate assurance of payment to the Utilities is sufficient to preclude unilateral termination by a utility. As adequate assurance of payment, Seda France offers to make bi-weekly, pre-payments to each Utiltiy for post-petition services provided by the Utility in the ordinary course of business starting the day the order granting this Motion is entered or twenty (20) days after the Petition Date, whichever date is later.

19. Any interruption in Seda France's Utilities would cause irreparable harm to its reorganization. Therefore, Seda France respectfully submits that the relief requested represents an

exercise of the Seda France's sound business judgment, is in the best interests of the Seda France's estate and creditors, and is necessary to prevent immediate and irreparable harm to its estate.

### iii. *Motion to Maintain and Use Prepetition Bank Accounts and Forms and to Allow Payment of Certain Prepetition Checks (the "Bank Motion")*

20. Seda France maintains a significant stock of certain pre-printed business forms and checks. Because they were all printed on a prepetition basis, none of these forms have the annotation Debtor-in-Possession, and the case number, printed on them as required by the United States Trustee guidelines. As it would be both extremely expensive, and disruptive for Seda France to have all such pre-printed business forms and checks re-printed with the moniker "Debtor-in-Possession" affixed thereon, Seda France has requested that it be allowed to stamp the same on each set of checks and/or forms until Seda France's supply of pre-printed forms runs out. Seda France requests that the Court approve this request as being in the best interests of its bankruptcy estate.

21. Further, Seda France requests a waiver of the Trustee's requirements that Bank Accounts be closed and new postpetition bank accounts be opened. If enforced in this case, the United Trustee's requirements would cause enormous disruption in Seda France's business. The maintenance of the Bank Accounts would greatly facilitate Seda France's "seamless transition" to postpetition operations.

22. In addition, Seda France has requested permission for its bank, Texas Capital Bank to pay certain prepetition checks that have not yet cleared its bank accounts. Seda France makes this request in order avoid delays in payment of debts incurred on a postpetition basis, while alienating as few of Seda France's vendors and creditors as possible. The checks that Seda France has requested permission to be paid are (1) employees and/or independent contracts, (2) Critical Vendors, and/or (3) Representatives.

7

23. Without the ability to use and maintain its prepetition Bank Accounts, have certain prepetition debts paid, and utilize its existing forms, the Debtor-in-Possession will suffer immediate and irreparable harm. In fact, without such relief, the Debtor-in-Possession will be forced to drastically alter its ordinary-course business practices. As such, the Debtor-in-Possession faces the risk that its operations may be severely impaired if authority is not granted immediately.

### iv. *Motion to Pay or Honor Prepetition Obligation to Certain Critical Vendors (the "Critical Vendors Motion")*

24. Seda France maintains relationships with certain vendors that are necessary and vital to its continued operations, and without which Seda France would have a difficult time operating in the ordinary course or reorganizing (the "Critical Vendors"). Some Critical Vendors have a contractual relationship with Seda France, while others have no such relationship and operate strictly as a month-to-month trade creditor. While dealt with in more specificity by the Critical Vendors Motion, and the exhibit attached thereto, the Critical Vendors include entities that ship Seda France's products overseas, entities that handle the management of Seda France's order-taking website, and entities that provide certain goods and services essentially to the production of the home fragrance products it produces. If any of these Critical Vendors were to cease doing business with Seda France, or even limit the amount or level of service they provide to Seda France, the value of its bankruptcy estate would suffer at best, and be destroyed at worst.

25. After a thorough review with Seda France's inside and outside counsel of the legal standards associated with the postpetition payment of prepetition amounts owed to the Critical Vendors, it is my firm belief that such payments are vitally important to allow Seda France to continue as a going-concern entity on a postpetition basis. If such payments are not approved by this Court, I believe the value of Seda France will be tremendously damaged, and its ability to reorganize may be called into question.

8
4488539.1
59713.1

### *v. Motion Pursuant to 11 U.S.C. § 107(b) to File Certain Proprietary Information Under Seal (the "Seal Motion")*

26. Seda France has filed a motion to file under seal certain of Seda France's vendors along with documents containing the names and contact information for Seda France's customers. The Sealed Information includes, but may not necessarily be limited to, (1) the names of certain vendors along with the services provided by such vendors; (2) the contact information for such vendors; and (3) the names and contact information for Seda France's customers. Specifically, in the Seal Motion, Seda France requests authority to submit the following documents under seal:

   A. Exhibits to the Critical Vendors Motion;

   B. Exhibits to the Bank Motion;

   C. Exhibits to Seda France's Schedules;

   D. Exhibits to Seda France's Statement of Financial Affairs; and

   E. Seda France's creditor matrix.

27. Cause exists for sealing the Sealed Information due to its potential effect on Seda France's ability to continue operations as a going-concern without the fear of its workforce or sales force constantly being "cherry-picked" by competing companies. The disclosure to parties-in-interest and competitors of the Sealed Information would undoubtedly cause a detrimental impact to the ultimate ability of Seda France to successfully reorganize. As a result, the Sealed Information is confidential commercial information, and such information should be sealed to protect Seda France's going-concern value.

28. The relief sought in the Seal Motion is directly related to the relief sought in the Critical Vendors Motion, Schedules, and Statement of Financial Affairs, and Judicial Economy

would best be served if the Seal Motion was considered at the same time as the First Day Motions.

### vi. *Motion for Payment of Prepetition Wage Claims (the "Wage Motion")*

29. Through Seda France's Wage Motion, it requests that this Court enter an Order, authorizing it to pay various employee-related prepetition obligations to, or for the benefit of, currently active employees, including claims for employee wages, salaries, commissions, and/or expense reimbursements (collectively, the "Employee Benefits").

30. Any delay in paying the employee wage claims will adversely affect Seda France's relationship with its employees and could irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of the employees is most crucial. Seda France faces the imminent risk that its operations may be severely impaired if it is not immediately granted authority to make payments described in this Motion. Employee support for Seda France's reorganization effort is crucial, particularly given the importance of employee morale and initiative in that effort. At this critical stage Seda France simply cannot risk the substantial disruption to its business operations that will result if Seda France is not permitted to pay the employee wage claims in the ordinary course of business. All Employees are critical to Seda France; the work they perform on behalf of Seda France is essential to its operations and a mass exodus following the Petition Date would destroy the bankruptcy estate's value.

### vii. *Motion for Authorization to Pay Prepetition Sales Commissions*

31. As discussed above, Seda France's sales force consists primarily of the Representatives. The Representatives market Seda France's products to companies and/or individuals with store fronts. The Representatives then purchase goods from Seda France to supply the products to the purchasers. The Representatives are paid a commission on their sales on a monthly basis.

32. The Representatives constitute Seda France' sales force, and the primary means by which Seda France's goods are marketed. Unless Seda France has the ability to assure the Representatives that the compensation owed to them will not be jeopardized by the bankruptcy process, Seda France fears that its ability to retain the Representatives will be significantly reduced, and consequently its ability to reorganize will be seriously hampered, thereby causing the estate immediate and irreparable harm. Therefore, Seda France seeks authorization to continue to compensate the Representatives, within Seda France's discretion, in the ordinary course of business, including such payments that may be due in exchange for services provided by the Representatives prior to the Petition Date.

33. The continued and uninterrupted support of the Representatives is the primary means by which Seda France can continue to operate and thereby maximize the value of its assets. As of the Petition Date, many Representatives were owed or had accrued various sums for Prepetition Commissions. Seda France estimates that, as of the Petition Date, approximately $28,917.21 is due for Prepetition Commissions.

34. Seda France believes that the payment of the Prepetition Commissions is essential for Seda France's reorganization, represents an exercise of Seda France's sound business judgment, is in the best interests of Seda France's estate and creditors, and is necessary to prevent immediate and irreparable harm to its estate. Simply put, the damage to the estate could be catastrophic if this relief is not granted.

*Signature Page Follows*

_____
Robert Hernandez, CEO of Seda France, Inc.

SUBSCRIBED and SWORN TO before me on the 15th day of October 2010.

*Penny S Keller*
_____
Notary Public, State of Texas

PENNY SUE KELLER
Notary Public, State of Texas
My Commission Expires
JULY 15, 2013

12

4488539.1
59713.1